IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

| | |
|---|---|
| Amerind Risk Management Corporation, | ) ) ) |
| Plaintiff, | ) **ORDER DENYING PLAINTIFF'S** |
| | ) **MOTION FOR SUMMARY** |
| vs. | ) **JUDGMENT** |
| | ) |
| Myrna Malaterre, Carol Belgarde, and Lonnie Thompson, | ) Case No. 4:07-cv-059 ) |
| | ) |
| Defendants. | ) |

_____

Before the Court is the Plaintiff's motion for summary judgment filed on June 24, 2008. See Docket No. 17. The Defendants filed a response in opposition to the motion on August 29, 2008. See Docket No. 25. The Plaintiff filed a reply brief on September 11, 2008. See Docket No. 29. For the reasons set forth below, the Plaintiff's motion for summary judgment is denied and summary judgment is granted in favor of the Defendants.

I.  **BACKGROUND**

The plaintiff, Amerind Risk Management Corporation (Amerind), administers a federally-regulated insurance risk pool. See Docket No. 20. Amerind is chartered under federal law for the purpose of providing insurance coverage for federally subsidized Indian housing owned and operated by Indian tribes and their housing authorities. See Docket No. 20. On December 28, 2001, the Turtle Mountain Housing Authority entered into a "Certificate of Coverage" contractual agreement with Amerind to provide insurance coverage to the Turtle Mountain Housing Authority for property damage and personal injury. See Docket No. 20-4. The defendants, Myrna Malaterre,

Carol Belgarde, and Lonnie Thompson are enrolled members of the Turtle Mountain Band of Chippewa Indians. See Docket No. 1.

On October 19, 2002, Stacey Bruce, Ruth Poitra, and Lonnie Thompson were guests in a house located on the Turtle Mountain Indian Reservation that was leased from the Turtle Mountain Housing Authority. See Docket Nos. 1 and 25. On that date, a fire destroyed the house, killed Stacey Bruce and Ruth Poitra, and seriously injured Lonnie Thompson. See Docket No. 25. At the time of the fire, the Turtle Mountain Housing Authority was insured by Amerind under the "Certificate of Coverage" agreement and a "Membership Subscription Agreement." See Docket Nos. 20-3 and 20-4.

On January 23, 2003, Myrna Malaterre, the mother of decedent Stacey Bruce; Carol Belgarde, the mother of decedent Ruth Poitra; and Lonnie Thompson filed a wrongful death and personal injury action against the Turtle Mountain Housing Authority in Turtle Mountain Tribal Court (Tribal Court).[1] See Docket Nos. 25 and 25-2. On September 5, 2003, the complaint was amended to include Amerind as a defendant. See Docket No. 25-10. On July 1, 2004, Malaterre, Belgarde, and Thompson filed a declaratory judgment action against Amerind in federal court, seeking a determination that the insurance policy issued by Amerind provided coverage for the claims. See Docket No. 25-18. On December 8, 2004, Amerind filed a motion to dismiss the action in federal court contending that dismissal was appropriate under the tribal exhaustion doctrine and on the basis of sovereign immunity. On June 20, 2005, this Court granted the motion to dismiss without prejudice, finding that tribal court remedies had to be exhausted before the Court could

---

[1] Stacey Bruce and Ruth Poitra were enrolled members of the Turtle Mountain Indian Reservation. See Docket No. 25-10.

2

become involved in the dispute.  See Malaterre v. Amerind Risk Management, 373 F. Supp. 2d 980 (D.N.D. 2005).

On October 20, 2005, the Tribal Court dismissed the Turtle Mountain Housing Authority pursuant to a stipulation.  See Docket Nos. 25-27 and 25-28.  On November 10, 2005, Amerind filed a motion to dismiss the action in Tribal Court contending that the Turtle Mountain Housing Authority was an indispensable party and, therefore, a direct action could not be maintained against Amerind.  See Docket No. 25-29.  On December 15, 2005, the Tribal Court denied Amerind's motion to dismiss and found that "[b]y contract and by its actions, Amerind has assumed control over the defense of this matter."  See Docket Nos. 25-31.  Amerind appealed the Tribal Court's decision to the Turtle Mountain Tribal Court of Appeals.  See Docket No. 25-32.  On July 5, 2007, the Tribal Court of Appeals affirmed the lower court's ruling.  See Docket No. 25-36.

Amerind then commenced a declaratory judgment action in federal court on September 4, 2007.  See Docket No. 1.  Amerind seeks "a determination that an Indian tribe exceeds its regulatory and adjudicatory jurisdiction when it exercises authority over a non-member that is a federal corporation comprehensively regulated by federal law."  See Docket No. 1.  Amerind requests that this Court declare that Amerind is not subject to a direct action and further requests that the Court enjoin the Defendants from proceeding with a civil action in tribal court against Amerind.  See Docket No. 1.  On June 24, 2008, Amerind filed a motion for summary judgment.  See Docket No. 17.

## II. LEGAL DISCUSSION

### A. DECLARATORY JUDGMENT ACT

The Plaintiff seeks declaratory relief under the Declaratory Judgment Act codified at 28 U.S.C. § 2201. "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). To that end, the Act specifically provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201(a) (emphasis added). The Act has been "repeatedly characterized" by the United States Supreme Court as "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." Wilton, 515 U.S. at 287 (citations omitted). As stated by the United States Supreme Court, "[b]y the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." Id. at 288. Ultimately, "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." Id. at 287. Any willingness to entertain such relief in this case would yield to the applicability of the tribal exhaustion doctrine. See Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840, 849 (8th Cir. 2003) ("The issue of tribal exhaustion is a threshold one because it determines the appropriate forum.").[2]

---

[2] It has been established in the Eighth Circuit that tribal exhaustion precedes the tribal immunity inquiry. See Davis v. Mille Lacs Band of Chippewa Indians, 193 F.3d 990, 992 (8th Cir. 1999). As one court explained, "The Eighth Circuit has held that a district court should begin this phase of its inquiry by addressing exhaustion and, if it determines that tribal remedies must be exhausted, give the tribal court the first crack at considering the bona fides of the sovereign immunity defense." Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 28 (1st Cir. 2000).

4

B.    **TRIBAL COURT JURISDICTION**

Pursuant to 28 U.S.C. § 1331, this Court is empowered to determine whether a tribal court has exceeded the lawful limits of its jurisdiction. Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians, 471 U.S. 845, 853 (1985). "The question of whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a 'federal question' under § 1331." Id. at 852.

For nearly two centuries, courts of the United States "have recognized Indian tribes as 'distinct, independent political communities,' qualified to exercise many of the powers and prerogatives of self-government." Plains Commerce Bank v. Long Family Land and Cattle Co., 128 S. Ct. 2709, 2718 (2008) (citing Worchester v. Georgia, 6 Pet. 515, 559 (1832); United States v. Wheeler, 435 U.S. 313, 322-23 (1978)). Indian tribes possess attributes of sovereignty to govern their members and their territory. United States v. Mazurie, 419 U.S. 544, 557 (1975). "[T]hey are 'a separate people' possessing 'the power of regulating their internal and social relations . . . .'" Id. (quoting United States v. Kagama, 118 U.S. 375, 381-82 (1886); McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 173 (1973)). An essential attribute of that sovereignty is the power to hear and adjudicate disputes arising on reservation land. Weeks Constr., Inc. v. Oglala Sioux Hous. Auth., 797 F.2d 668, 673 (8th Cir. 1986). Civil jurisdiction over activities arising on reservation lands "presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute. 'Because [a tribe] retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from [Congressional] silence .

. . . is that the sovereign power . . . remains intact.'" Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 18 (1987) (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 149 n.14 (1982)).

An analysis of the Tribal Court's jurisdiction starts with the United States Supreme Court's decision in Montana v. United States, 450 U.S. 544 (1981), a "pathmarking case concerning tribal civil authority over nonmembers." Strate v. A-1 Contractors, 520 U.S. 438, 445 (1997). The Supreme Court in Montana specifically addressed the reach of tribal jurisdiction over non-Indian parties. In Montana, the Supreme Court announced the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of non-members of the tribe. However, Indian tribes retain sovereignty over non-members in two specific instances:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

450 U.S. 544, 565-66 (internal citations omitted). The burden rests on the tribe to establish that one of the two Montana exceptions is satisfied. Plains Commerce Bank, 128 S. Ct. at 2720.

The Supreme Court further explained the Montana rule in Strate v. A-1 Contractors, 520 U.S. 438, 446 (1997):

> Montana thus described the general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation, subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe's political integrity, economic security, health or welfare.

Even though Montana addressed the authority of tribes to exercise civil jurisdiction on the reservation and on non-Indian fee lands, the Supreme Court has since clarified that Montana's analysis is not limited to fee land disputes.  See Brendale v. Confederated Tribes and Bands of Yakima Indian Nation, 492 U.S. 408, 426-27 (1989).

The rulings of the United States Supreme Court in Montana and Strate make clear that tribal jurisdiction over non-members of the tribe or non-Indians is limited.  Numerous Supreme Court cases analyzing civil jurisdiction over a non-Indian have cited to or relied upon Montana.  See Plains Commerce Bank, 128 S. Ct. 2709 (2008) (following Montana's principles and finding no tribal interest in the sale of non-Indian fee land); Nevada v. Hicks, 533 U.S. 353 (2001) (following Montana's principles and finding no tribal interest to regulate the ability of state officials to investigate off-reservation violations of state law); Brendale, 492 U.S. 408 (1989) (following Montana's principles and finding no tribal interest in zoning lands held in fee by non-Indians); South Dakota v. Bourland, 508 U.S. 679, 694-95 (1993) (citing Montana for the proposition that "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation."); New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 333 (1983) (citing Montana for the proposition that "A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is equally well established.").

In this case, the Turtle Mountain Tribal Court does not have civil jurisdiction over the conduct of Amerind on Indian land unless one of the two recognized Montana exceptions is found to apply.  Neither party has argued that the second exception, which concerns activity that affects the tribe's political integrity, economic security, health, or welfare, applies to this action.

With respect to the first Montana exception, the Turtle Mountain Tribal Court retains jurisdiction over the conduct of Amerind if Amerind entered into "consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." Amerind contends that this exception does not apply because Amerind entered into a contractual agreement solely with the Turtle Mountain Housing Authority and, therefore, there is no consensual relationship between the Defendants and Amerind. Amerind further argues that because there was no consensual relationship between the Defendants and Amerind, a direct action cannot be pursued against Amerind without the Turtle Mountain Housing Authority being named a party to the lawsuit. The defendants contend that Amerind's interpretation of Montana is misplaced because the subject matter giving rise to this lawsuit involves an insurance contract and Amerind providing coverage for tribal property located on tribal land for the benefit of the tribe and its members.

As support for its claim that a consensual relationship is lacking, Amerind relies on Strate v. A-1 Contractors, 520 U.S. 438 (1997), and Atkinson Trading Co., Inc. v. Shirley, 532 U.S. 645 (2001). Amerind contends that both Strate and Atkinson Trading establish that a consensual relationship with the Turtle Mountain Housing Authority is insufficient to establish a consensual relationship with the Defendants.

In Atkinson Trading, the Supreme Court considered whether the tribe had the authority to impose a hotel occupancy tax on a hotel located on non-Indian fee land and owned by a non-member. At issue was whether the consensual relationship between the non-member hotel owner and the tribe was sufficient under Montana for the tribe to tax the hotel. The tribal tax commissioner argued that the relationship was sufficient because the hotel and its occupants benefited from tribal emergency services, such as tribal police and tribal emergency medical services, which would

8

respond to an emergency call from the hotel.  Atkinson Trading, 532 U.S. at 654-55.  The Supreme Court disagreed with the tax commissioner and noted that the mere benefit of tribal emergency services was insufficient to create a consensual relationship.  Id. at 655.

> The consensual relationship must stem from 'commercial dealing, contracts, leases, or other arrangements,' and a nonmember's actual or potential receipt of tribal police, fire, and medical services does not create the requisite connection.  If it did, the exception would swallow the rule: All non-Indian fee lands within a reservation benefit, to some extent, from the 'advantages of a civilized society' offered by the Indian tribe.

Id. (internal citations omitted).  The Supreme Court found that the relationship between the hotel owner and tribe was too tenuous to create a consensual relationship.  As a result, the Supreme Court struck down the tax.  Id. at 656-57.

Amerind contends that the tenuous relationship between the hotel owner and the tribe in Atkinson Trading is akin to Amerind's relationship with the Defendants.  Specifically, Amerind states:

> As in Strate and Atkinson Trading, there is no nexus here between Malaterre's direct-action claim and AMERIND's consensual relationship with the Housing Authority because (a) her direct-action claim is based on the Tribal Court's misinterpretation of 24 C.F.R. § 1000.136(a) – a federal regulation independent of that relationship, and (b) the Housing Authority is a stranger to Malaterre's claim against AMERIND.
>
> Additionally, here, even if a nexus somehow existed under the Scope of Coverage Agreement, Malaterre voluntarily severed that nexus when she dismissed the Housing Authority from the suit with prejudice.

See Docket No. 20, pp. 9-10.

The present case is not similar to the situation that existed in Atkinson Trading where the only benefit to the non-member was the availability of tribal emergency services.  The Turtle Mountain Housing Authority is located on the Turtle Mountain Indian Reservation and it provides

9

federally subsidized housing to its members. Amerind entered into a consensual relationship with "the tribe or its members" when it agreed to insure the Turtle Mountain Housing Authority against personal injury and property loss. See Docket No. 20-4. For receipt of this broad coverage, the Turtle Mountain Housing Authority made significant annual payments to Amerind: $314,160 in 2000; $324,704 in 2001; $370,380 in 2002; $453,109 in 2003; and $418,489 in 2004. See Docket No. 25-41, pp. 57-59, 62, 63, 65. The Turtle Mountain Housing Authority paid the annual insurance premiums from federal grants which were provided to the Housing Authority to maintain Indian housing on the reservation. See Docket No. 25-41, pp 33-35. Even though Amerind contracted directly with the Turtle Mountain Housing Authority, Amerind had a consensual relationship with "the tribe or its members" to protect life and property on the Turtle Mountain Indian Reservation in accordance with the terms and conditions of the "Certificate of Coverage" and the "Membership Subscription Agreement." A review of the liability policy reveals that it provides broad coverage for third party claims for personal injury or "bodily injury" as defined within the policy. See Docket No. 20-4. None of the exclusions or defenses asserted under the policy appear to have been triggered.

The Court's finding of the existence of a consensual relationship with "the tribe or its members" is not inconsistent with Strate. In Strate v. A-1 Contractors, the Supreme Court considered whether a tribal court had jurisdiction over a civil action arising out of a motor vehicle accident that occurred on a portion of a public highway maintained by the state under a federally granted right-of-way over Indian reservation land. An overview of the factual and procedural history of Strate is necessary in understanding the Supreme Court's ruling.

Gisela Fredericks and Lyle Stockert, an employee of A-1 Contractors, were involved in a motor vehicle accident that occurred on a state highway that was maintained by the state under a right-of-way granted by the United States to the highway department. Strate, 520 U.S. at 442-43. A-1 Contractors were under a subcontract with the tribe to complete work within the boundaries of the reservation. Neither Fredericks nor Stockert were members of the tribe. Nonetheless, Fredericks brought a tort claim against Stockert and A-1 Contractors in tribal court which determined that it had jurisdiction over the dispute. Before the tribal court resolved the matter, Stockert and A-1 Contractors filed an action in federal district court to enjoin the proceedings in tribal court. The federal district court determined that the tribal court had jurisdiction over the matter and dismissed the federal action. Stockert and A-1 Contractors then appealed the decision to the Eighth Circuit Court of Appeals, where a divided panel affirmed the decision of the federal district court. See A-1 Contractors v. Strate, 1994 WL 666051 (8th Cir. Nov. 29, 1994). The Eighth Circuit granted a rehearing *en banc* and, on rehearing, reversed the district court's judgment. See A-1 Contractors v. Strate, 76 F.3d 930 (8th Cir. 1996). On rehearing, the Eighth Circuit determined that the tribal court lacked subject matter jurisdiction over the dispute pursuant to Montana.

On appeal, the United States Supreme Court considered whether the Eighth Circuit properly applied the Montana framework to the facts of the case. The Supreme Court noted that the accident occurred on a portion of a North Dakota state highway that ran through the reservation but was not under the dominion or control of the tribe.

> Forming part of the State's highway, the right-of-way is open to the public, and traffic on it is subject to the State's control. The Tribes have consented to, and received payment for, the State's use of the 6.59-mile stretch for a public highway. They have retained no gatekeeping right. So long as the stretch is maintained as part of the State's highway, the Tribes cannot assert a landowner's right to occupy and exclude. Cf. Bourland, 508 U.S. at 689 (regarding reservation land acquired by the

11

> United States for operation of a dam and a reservoir, Tribe's loss of "right of absolute and exclusive use and occupation . . . implies the loss of regulatory jurisdiction over the use of the land by others").

Strate, 520 U.S. at 455-56.

To determine whether a consensual relationship existed, the Supreme Court examined Williams v. Lee, 358 U.S. 217, 223 (1959) (finding tribal jurisdiction over a lawsuit arising out of an on-reservation sales transaction between a non-member plaintiff and member defendants); Morris v. Hitchcock, 194 U.S. 384 (1904) (upholding tribal taxation on a non-member who owned livestock within tribal land); Buster v. Wright, 135 F. 947, 950 (8th Cir. 1905) (upholding tribal taxation of non-members who conducted business within tribal land); and Washington v. Confederated Tribes of Coville Indian Reservation, 447 U.S. 134, 152-54 (1980) (upholding tribal taxation of on-reservation cigarette sales to non-members). Applying these cases, the Supreme Court in Strate concluded that the highway accident did not constitute a consensual relationship: "The tortious conduct alleged in Fredericks' complaint does not fit [the first exception]. The dispute, as the Court of Appeals said, is 'distinctly non-tribal in nature.' It 'arose between two non-Indians involved in [a] run-of-the-mill [highway] accident.'" Strate, 520 U.S. at 457 (quoting A-1 Contractors v. Strate, 76 F.3d 930, 940 (8th Cir. 1996)).

Relying on the Eighth Circuit's findings, the Supreme Court stated, "Although A-1 was engaged in subcontract work on the Fort Berthold Reservation, and therefore had a 'consensual relationship' with the Tribes, 'Gisela Fredericks was not a party to the subcontract, and the [T]ribes were strangers to the accident.'" Id. (quoting A-1 Contractors, 76 F.3d at 940). The Supreme Court also concluded that the complaint did not fit within the second Montana exception. Id. at 459. In affirming the ruling of the Eighth Circuit Court of Appeals, the Supreme Court held that "tribal

courts may not entertain claims against nonmembers arising out of accidents on state highways, absent a statute or treaty" granting the tribe such authority. Id. at 442. Therefore, the Supreme Court's holding was specific to factual situations involving motor vehicle accidents on a state highway by non-members.

The Court finds that this dispute is distinctively tribal in nature. Amerind administers a self-insurance risk pool that insures federally subsidized Indian housing owned and operated by Indian tribes. On December 28, 2001, Amerind entered into a "Certificate of Coverage" agreement with the Turtle Mountain Housing Authority to insure the Housing Authority against claims of personal injury, property damage, business liability, employee dishonesty, and tribal housing officials' liability.[3] See Docket No. 20-4. On October 19, 2002, a fire started in a house located on the Turtle Mountain Indian Reservation which was owned by the Turtle Mountain Housing Authority. See Docket No. 25. The parties do not dispute that the Turtle Mountain Housing Authority was insured under the terms and conditions of the insurance agreement at the time of the fire. Stacey Bruce and Ruth Poitra died as a result of the fire and Lonnie Thompson was seriously injured. See Docket No. 25.

The Defendants initiated a wrongful death and personal injury action against Amerind in Turtle Mountain Tribal Court for the damages sustained as a direct result of the fire. See Docket No. 25-10. The Defendants are members of the Turtle Mountain Indian Reservation. See Docket No. 25. The contract between Amerind and the Turtle Mountain Housing Authority is directly at

---

[3] The "Certificate of Coverage" agreement provides in pertinent part, "**We** [Amerind] cover damages a **covered person** is legally obligated to pay for **advertising injury**, **personal injury**, or **property damage** which takes place anytime during the term of coverage and are caused by an **occurrence**, unless stated otherwise or an exclusion applies. Exclusions to this coverage are described in the Cause of Loss Exclusions Section." See Docket No. 20-4, p. 23 (emphasis in original).

the heart of this dispute. Amerind is a party to this action because it entered into a consensual relationship with "the tribe or its members" and it contracted with the Turtle Mountain Housing Authority to provide insurance coverage for claims that arose out of the fire of October 19, 2002.

The Court finds the holding of the Turtle Mountain Tribal Court of Appeals, as set forth in its Memorandum Decision of July 5, 2007, to be persuasive and the holding is incorporated by reference in this decision. See Docket No. 20-8. In that decision, the Turtle Mountain Tribal Court of Appeals held that a direct action lies against Amerind if the plaintiffs (Malaterre et al.) can establish that the Turtle Mountain Housing Authority was negligent and that such negligence was the proximate cause of the injuries sustained by the plaintiffs. See Docket No. 20-8. Amerind contends that the Turtle Mountain Tribal Court of Appeals decision is misguided and contrary to federal law. However, the Court notes that Amerind specifically agreed in the insurance contract that if any provisions of the policy conflict with tribal laws, then the terms and conditions of the policy are amended to conform to those laws. See Docket No. 20-4, pp. 93, 135. In other words, Amerind contractually agreed that a direct action lies against the insurer (Amerind) by a third party when tribal laws on the Turtle Mountain Indian Reservation so dictate.

The Court finds, as a matter of law, that the first Montana exception applies and that the Turtle Mountain Tribal Court has not exceeded its jurisdiction by exercising authority over Amerind Risk Management Corporation under the circumstances. The Court declines to enjoin the defendants from proceeding with a civil action in tribal court against Amerind. This case has been lingering in the tribal and federal courts for nearly six years. Justice requires that the case proceed to trial in tribal court and that the defendants be afforded a forum to litigate their claims.

**III.     CONCLUSION**

The Court finds, as a matter of law, that this case satisfies the first exception of <u>Montana v. United States</u>, 450 U.S. 544, 565-66 (1981). A consensual relationship exists between Amerind Risk Management Corporation and the Turtle Mountain tribe or its members. Amerind voluntarily entered into a contractual relationship with the tribe and the Turtle Mountain Housing Authority through the "Certificate of Coverage" agreement and "Membership Subscription Agreement." The contractual agreements were executed for the benefit of the Turtle Mountain Indian Reservation, the Turtle Mountain Housing Authority, and members of the tribe. Amerind agreed to be bound by the laws of the tribe, the Turtle Mountain Tribal Court, and the Turtle Mountain Tribal Court of Appeals if any such laws are in conflict with the terms of the insurance policy. In essence, Amerind agreed to be bound by the decision of the Turtle Mountain Tribal Court of Appeals rendered on July 5, 2007, which expressly held that a direct action lies against Amerind.

For the reasons stated above, the motion for summary judgment (Docket No. 17) is **DENIED**, and the Court, *sua sponte*,[4] grants summary judgment in favor of the Defendants.

**IT IS SO ORDERED.**

Dated this 14th day of November, 2008.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court

---

[4] The prevailing view is that summary judgment may be granted in favor of a non-moving party or *sua sponte* by the court. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986); <u>Boyle v. Anderson</u>, 849 F. Supp. 1307, 1309 (D. Minn. 1994); <u>see</u> generally 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure Civil § 2720 (3d ed. 1998).